COCA-COLA BOTTLING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SIDNEY W. SOUERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JAMES P. BUTLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALFRED B. FREEMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

F. E. GUNTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27180, 27181, 27624, 27307, 31406–31409, 31550.

Promulgated March 11, 1931.

*John J. Finnorn, Esq.*, for the petitioners.
*R. W. Wilson, Esq.*, for the respondent.

694

696

### OPINION.

LOVE: We shall first consider the four proceedings relating to the year 1921. These are the individual appeals of Souers, Butler, Gunter, and Freeman, Docket Nos. 27180, 27181, 27264, and 27307, respectively. The deficiencies involved have been asserted in each instance as a liability of the petitioner for total unpaid income and profits taxes of the Illinois Company for the year 1921, in the amount of $780.89. The adjustments giving rise to determination of the deficiency against the taxpayer, were pleaded as error, but upon hearing and brief the petitioners abandoned such allegations, the brief stating:

As to the 1921 case, the point upon which the petitioners rely is that no notice of demand was ever served upon the original taxpayer and no basis therefore exists for the assessment of any liability against the transferees, the tax being barred by limitation against the original taxpayer when the sixty-day letter was mailed to the transferees.

It may be pointed out that substantially identical 60-day letters were mailed to each of the transferees.

The 1921 return of the Illinois Company was filed on March 15, 1922. The four-year period for assessment for the year 1921, provided by section 250 (d) of the Revenue Act of 1921, and by subsequent revenue acts, expired on March 15, 1926. Although the petitioners deny knowledge of receipt of a deficiency letter by that company for the year 1921, we have found that such a letter was transmitted to the company by registered mail under date of February 3, 1926, in accordance with the provisions of section 274 (a) of the Revenue Act of 1924. This has been established from certified copies of the said letter and of the respondent's registered mailing list for the date mentioned. No appeal was filed and the deficiency was assessed against the company on the respondent's assessment list for the 1st District of Illinois, dated May 25, 1926.

At the time the said assessment was made and when the notices were mailed to petitioners (February 25, 1927), the Illinois Company had been dissolved and its assets had been distributed to petitioners in liquidation. It had ceased to do business and maintained no office. We have held under substantially similar facts in *J. H. Johnson et al.*, 19 B. T. A. 840, 846, that in such a situation:

* * * it was not essential that the respondent should proceed against the transferor before taking steps to collect the tax from the transferee. It is sufficient that he has proceeded against the transferee within the time prescribed by the statute therefor. *Woodley Petroleum Co. et al.*, 16 B. T. A. 253; *Angier Corporation*, 17 B. T. A. 1376.

See *United States* v. *Fairall*, 16 Fed. (2d) 328, and *John Thomson, Jr.*, 20 B. T. A. 1.

In *Kathleen O'Brien et al.*, 20 B. T. A. 167, we considered facts strikingly parallel to those herein involved. In that case the taxpayer, Jacob Spahn had filed his return for the year 1921 on March 15, 1922. The deficiency was assessed against the taxpayer in May, 1926, although he had died August 27, 1924, and his estate was settled and the executor discharged on March 26, 1926. We, therefore, said that the petitioners' contentions are:

\* \* \* that the period within which assessment of the 1921 tax could have been made had expired when the notice of deficiency was mailed to them on March 8, 1927, \* \* \*

Section 280 of the Revenue Act of 1926 contains the provision with respect to the period within which assessments can be made against transferees. The pertinent portions of the section read as follows:

(b) The period of limitation for assessment of any such liability of a transferee or fiduciary shall be as follows:

(1) Within one year after the expiration of the period of limitation for assessment against the taxpayer; \* \* \*

\* \* \* \* \* \* \*

(c) For the purposes of this section, if the taxpayer is deceased, or in the case of a corporation, has terminated its existence, the period of limitation for assessment against the taxpayer shall be the period that would be in effect had the death or termination of existence not occurred.

Jacob Spahn's return for 1921 was filed March 15, 1922. The four-year period for assessment of the taxes for that year provided by section 250 (d) of the Revenue Act of 1921 and subsequent revenue acts expired March 15, 1926.

Under the provisions of Section 280 the period of limitation for assessment of the taxpayer's liability against the transferees expired March 15, 1927, one year after the expiration of the period of limitation for assessment against the taxpayer. The assessment for 1921 was not barred at the time the notice of March 8, 1927, was mailed to the transferees. See *J. H. Johnson et al*, 19 B. T. A. 840.

It follows that the respondent has proceeded against these transferees within the period provided by statute and, therefore, assessment against them is not barred. *J. H. Johnson et al, supra.*

The proceedings of Gunter and Freeman, Docket Nos. 27264 and 27307, respectively, present a second issue relating to the year 1922. The petitioners named have, by multiple assignments of error, attacked the constitutionality of section 280 of the Revenue Act of 1926, under the provisions of which the deficiencies here in controversy have been proposed for assessment against them. In *Henry Cappellini*, 14 B. T. A. 1269, the Board held that a petitioner, seeking a redetermination of his liability as a transferee under the said section 280, may not question the validity of that section. That decision is controlling here. Cf. *J. W. Oglesby, Jr., et al.*, 16 B. T. A. 1191; *J. T. Crane et al.*, 19 B. T. A. 881; and *Joseph A. Steinle, Administrator, et al.*, 19 B. T. A. 325.

There remain for consideration the proceedings of Souers, Butler, Gunter and Freeman, Docket Nos. 31406, 31407, 31550, and 31408,

respectively, each involving the year 1922, and the period January 1 to April 30, 1925, and the appeal of the Illinois Company, Docket No. 31409, involving only the last mentioned period. Although the pleadings raise no question of our jurisdiction, we believe that for reasons which we shall now set forth, we can not properly make a redetermination in respect to the company's appeal.

The deficiency letter was addressed to the " Coca-Cola Bottling Company, 456 East 31st Street, Chicago, Illinois, % Louisiana Coca-Cola Bottling Company, Canal and Robertson Streets, New Orleans, Louisiana." The addressee has been referred to herein as the Illinois Company.

The petitioner states:

That the Taxpayer is a corporation, duly organized, formerly existing, and voluntarily dissolved pursuant to the Laws of the State of Illinois, with its principal office, during the tenure of. its business, at 456 East 31st Street, Chicago, Illinois, herein appearing through Alfred B. Freeman, President of the Coca-Cola Bottling Company of Chicago, Inc., a corporation organized and existing pursuant to the Laws of the State of Louisiana, with its principal office and place of business at 456 East 31st Street, in the City of Chicago, in the State of Illinois, and individually a member of a syndicate composed of said Alfred B. Freeman and Messrs. James P. Butler and Sidney W. Souers of the City of New Orleans and F. E. Gunter of the City of Saint Louis, in the State of Missouri, which syndicate constituted the principal stockholders of said Coca-Cola Bottling Company at the date of its liquidation and final and complete voluntary dissolution during the Calendar year 1925.

The verification was by affidavit as follows:

AFFIDAVIT

STATE OF LOUISIANA,
   *Parish of Orleans:*

BEFORE ME, the undersigned Notary Public, personally came and appeared Alfred B. Freeman, who being by me first duly sworn, deposes and says that he is President of the Coca-Cola Bottling Company of Chicago, Inc., a Corporation organized and existing pursuant to the Laws of the State of Louisiana, which Corporation purchased the assets and assumed such liabilities of the Coca-Cola Bottling Company, Petitioner herein, as appeared on the books of the vendor, the said Coca-Cola Bottling Company, at the date of the purchase; that he was one of the principal stockholders of said Coca-Cola Bottling Company, being a Member of a Syndicate holding the majority of the stock thereof; that he has read the above and foregoing petition and that the allegations therein contained, except such as are made on information and belief, are true and correct and that he verily believes the latter to be true.

(Signed)     ALFRED B. FREEMAN.

MAX M. SCHAUMBURGER
   *Attorney at Law and Notary Public*
      *620–1 Whitney Central Building,*
         *New Orleans, La.*

Sworn to and Subscribed before me, this *17th* day of *September*, 1927.
[SEAL]         (Signed) ·    MAX M. SCHAUMBURGER,
*Notary Public.*

The answer admits, and testimony establishes, that the Illinois Company was dissolved and fully liquidated some time during 1925. In *First Bond & Mortgage Co.*, 21 B. T. A. 1, we said:

\* \* \* It has frequently been held that when a corporation is dissolved, it is dead, and any prolongation of its existence, even for purposes of litigation, is entirely dependent upon statutory authority. *Oklahoma Natural Gas Company* v. *Oklahoma*, 273 U. S. 257. \* \* \*

Section 14, chapter 32, of the General Laws of the State of Illinois (p. 1889, Callaghans Illinois Statutes Annotated), provides:

14. Continuance of Powers after expiration—Suing and defending § 14. All corporations organized under the laws of this state, whose powers may have expired by limitation or otherwise, shall continue their corporate capacity for two years for the purpose only of collecting debts due such corporation and selling and conveying property and the effects thereof. Such corporations shall use their respective names for such purposes and shall be capable of prosecuting and defending all suits at law or in equity.

See also § 79, chapter 32, of the same statutes.

The petition in the proceeding under discussion was filed with the Board on September 22, 1927. We do not know the exact date of dissolution of the Illinois Company, it only appearing that the event occurred during 1925. Granting, but not deciding, that the above quoted statute is in any way applicable to proceedings before the Board, it may be, nevertheless, that the two-year limited extension of corporate powers had expired before this proceeding was instituted and, therefore, that no legal entity existed to institute such a proceeding. Under such circumstances, the Board is without jurisdiction. *S. Hirsch Distilling Co.*, 14 B. T. A. 1073.

It happens, however, that in at least one other particular the record definitely fails to demonstrate jurisdiction. In *Consolidated Companies, Inc.*, 15 B. T. A. 645, we said:

In an action brought in a court of limited jurisdiction, it is generally the rule that all facts necessary to show jurisdiction of the court must be pleaded and proved. 31 Cyc. 57–104. The jurisdiction of this Board is prescribed and limited by statute, and all essential jurisdictional facts must therefore affirmatively appear.

\* \* \* \* \* \* \*

\* \* \* The jurisdiction of the Board depends directly upon the filing of the petition for redetermination by the taxpayer against whom the Commissioner has determined the deficiency. Unless the petition is filed by such taxpayer, or by some person lawfully authorized to act in behalf of the taxpayer, the Board is without jurisdiction.

Among the essential facts to be pleaded and proven, is adequate authority by which the person, purporting to present an appeal on behalf of a corporation, acts. *Louisiana Naval Stores, Inc.*, 18 B. T. A. 533. The Board will raise this question of its own volition. *Martha M. Hanify et al.*, 21 B. T. A. 379.

This proceeding is captioned: "Coca-Cola Bottling Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent." It states that the said company is:

herein appearing through Alfred B. Freeman, * * * a member of a syndicate composed of said Alfred B. Freeman and Messrs. James P. Butler, * * * Sidney W. Souers * * * and F. E. Gunter, * * * which syndicate constituted the principal stockholders of said Coco-Cola Bottling Company at the date of its liquidation and final and complete voluntary dissolution during the calendar year 1925.

The petition is verified by Freeman, individually. There is nothing in the record to indicate that Freeman or any member of the syndicate ever bore any other relation to the Illinois Company than that of a stockholder.

Unless expressly or impliedly authorized, the stockholders or members of a corporation are not its agents in any sense merely because of their relations, and, acting as individuals, they have no power to bind it. Fletcher, Cyclopedia of Corporations, page 2916; *Humphreys* v. *McKissock*, 140 U. S. 304; *Sellers* v. *Greer*, 172 Ill. 540; 50 N. E. 246; *Bouton* v. *Board of Supervisors McDonough Co.*, 84 Ill. 384; *Hopkins* v. *Roseclare Lead Co.*, 72 Ill. App. 372. In *Beardstown Pearl Button Co.* v. *Oswald*, 130 Ill. App. 290, the Court said: "Under our statutes a corporation can act only through its board of directors and officers."

There is no pleading or evidence of express or implied authority for Freeman or his comembers of the syndicate to act for the Illinois Company.

It follows that even if this proceeding was commenced within two years following dissolution of the corporation and that its commencement is within the extension of powers granted by section 14, *supra*, of the Illinois statutes, yet the proceedings not being authorized, no decision of ours would bind the Illinois Company. Our determination of a deficiency under such circumstances would be a nullity, and accordingly, we hold on our own motion, that we have no jurisdiction. *S. Hirsch Distilling Co., supra.*

The last group of proceedings to be discussed is composed of the four individual appeals of Souers, Butler, Gunter, and Freeman, relating to the year 1922, and the period January 1, to April 30, 1925.

With respect to each of the taxable periods mentioned, these petitioners attack the constitutionality of section 280 of the Revenue Act of 1926, under the provisions of which the liabilities have been proposed. With one exception, relating to the proposed penalty in the amount of $2,644.64 for the 1925 period, the same, or substantially the same, contentions were advanced in the appeals of Gunter

and Freeman relating to the year 1921. Such contentions were there denied on authority of *Cappellini, supra.* In the instant proceedings, they are denied on the same authority.

The one unique attack upon the constitutionality of section 280 relates only to the 1925 period and is pleaded in each case as follows:

The determination of the tax contained in the said deficiency letter aforesaid is based upon the following errors, to wit:

\*      \*      \*      \*      \*      \*      \*·

(4) That, should this Honorable Board hold that the said section of the said Revenue Act is constitutional and that the said Commissioner did not err in relying upon said section, then petitioner alleges that, although said section 280 of the Revenue Act of 1926 may authorize the imposition and assessment of tax (due by a transferor) directly against the transferee of its assets, said section of the Act does not and can not authorize the imposition and assessment of a penalty for delinquency in filing a return; and that if said section did or does authorize the assessment of a penalty against a transferee, that then, and in that case, the said section of said act is unconstitutional, null and void.

Section 280 (a) (1) of the Revenue Act of 1926 specifically authorizes the inclusion of " interest, additional amounts and additions to the tax " in the amount which may be assessed against· and collected from a transferee. A penalty is an addition to the tax. *Gutterman Strauss Co.*, 1 B. T. A. 243. Section 3176, Revised Statutes as amended by section 1003, Revenue Act of 1924. A contention respecting the constitutionality of section 280 so far as it authorizes the assertion of a liability of a transferee for penalties imposed upon his transferor, might therefore, be disposed of upon authority of *Cappellini, supra*, since such a contention is an attack upon a substantive provision of the said section 280. But we may point out that petitioners' pleadings respecting the assertion of a liability against them for a penalty imposed upon their transferor, do not raise an issue of law in respect to the constitutionality of the statute involved. In order to raise a question of law with respect to the constitutionality of a particular section of a revenue act, it is not sufficient to allege in general terms that the section attacked is unconstitutional. The specific constitutional provision alleged to be violated must be pleaded. *Frederick N. Dillon*, 20 B. T. A. 690. In the absence of such pleadings, petitioners' contentions must fail.

The only remaining issue is the March 1, 1913, value of the Coca-Cola franchise of the Illinois Company. Petitioners contend that the value of that franchise on the date mentioned was $89,536.96, the amount at which it was then carried on the company's books. The respondent, in computing a profit upon sale of the company's assets in 1925, has determined the March 1, 1913, value of the franchise as $7,870, which amount is stipulated to be the original cost of the asset when it was acquired in 1906.

Petitioners rely on three principal points in support of the valuation which they claim for the franchise. The first of these points is

that the franchise was carried on the books of the company prior to March 1, 1913, at the value which they now contend was its actual value on that date, i. e., $89,536.96. The second point is that " substantially contemporaneous stock sales " indicate a franchise value of the amount claimed on March 1, 1913. The third point is that competent expert testimony supports the valuation claimed on the basic date. We shall consider these contentions in the order named.

It should be borne in mind that the mere fact that an increase in value of the franchise had been entered on the books prior to March 1, 1913, does not establish that the franchise had in fact the value at which it was carried on that date. Book entries are not conclusive. *Doyle* v. *Mitchell Bros.*, 247 U. S. 179. The question is not what was written up as the value of the franchise, but what was the fair market value of the franchise on March 1, 1913. *York Hotel Corporation*, 1 B. T. A. 672; *Walcutt Brothers Co.*, 1 B. T. A. 910. Such facts, however, may be considered in connection with other facts.

The third point relied upon by petitioners in support of the franchise value claimed, is that competent expert testimony supports such a valuation. Petitioners presented two witnesses who offered their opinions as to the March 1, 1913, value of the franchise involved. These witnesses were Alfred B. Freeman, one of the petitioners, and Charles V. Rainwater. We shall consider their testimony separately and in some detail.

Freeman testified that he had been engaged in the Coca-Cola business since November 20, 1906, when he acquired interests in the Louisiana Coca-Cola Bottling Company and the Coca-Cola Bottling Company of Baton Rouge, domiciled at New Orleans and Baton Rouge, respectively. He has since acquired interests in various other Coca-Cola companies and is at present connected with the following named concerns in the capacities indicated: Louisiana Coca-Cola Bottling Company, secretary, treasurer and manager; Coca-Cola Bottling Company of Chicago, president; Great Lakes Coca-Cola Bottling Company, president; Wisconsin Coca-Cola Bottling Company, president; Baton Rouge Coca-Cola Bottling Company, secretary-treasurer; Hammond Coca-Cola Bottling Company, president; Coca-Cola Bottling Company of Lake Charles, president; Morgan City Coca-Cola Bottling Company, president; Wesson Oil Company, director; Snowdrift Company, director. He is also an officer and director of a mortgage company and was for three years vice president of a bank.

His attention was first directed to the Illinois Company in 1924. With the view of investing in it he then made an investigation of the company, particularly in respect of its lease, the territory and population served, and the possibilities for increasing the business and earnings by additional capital and more efficient management. He

formed an opinion that the business had not been managed to the best advantage for the preceding two or three years because the persons conducting it had had no Coca-Cola experience when they went into the business and, according to their statements, were operating on limited capital.

He found that the company's franchise was what is known as a "first-line" contract, i. e., an exclusive bottling franchise for a stated territory, under which certain so-called "sub-bottlers'" franchises might be granted, covering limited areas within such territory. A "first-line" franchise holder receives either a flat rental for the territory granted, or a royalty, usually 20 cents per gallon for syrup furnished "sub-bottlers."

Freeman also familiarized himself with the company's books with the view of ascertaining the possibilities of incurring an income tax liability in event he acquired control of the company and desired to dispose of its assets in any way. While the records for that date were not available, he was informed that the franchise involved had been set up on the company's books at a value of $89,536.96, sometime prior to March 1, 1913.

The franchise of the Illinois Company embraced territory described as the "City of Chicago and 50 miles therefrom in all directions in the State of Illinois." Included in that area are the towns of Aurora, Joliet, Waukegan, Elgin, and Chicago Heights and the Great Lakes Naval Training Station. Joliet is the site of the Illinois Steel Company's plant, the city having a population approximately equal in number and character to that of Birmingham, Ala., where as the witness knew, sale of Coca-Cola was profitable. Whether or not such conditions existed in 1913, does not definitely appear.

The territory embraced by the franchise had in 1913 a population of about 2,000,000. The witness estimated that "any reasonable development of the franchise in the Chicago territory would mean, on the 10 bottles per capita basis, 20,000,000 bottles of Coca-Cola, or 166,666 gallons per annum, and the experience of bottlers in plants that were the average plants, was that the profit per annum should approximate $1 per gallon."

Based upon the factors recited above, and his experience in the business, the witness stated that the franchise of the Illinois Company would, in his opinion, be "worth several hundred thousand dollars * * * certainly more than $89,000 or more than even $100,000" on March 1, 1913.

The second witness who offered his opinion as to the March 1, 1913, value of the franchise involved, was Charles V. Rainwater, secretary and treasurer of the Coca-Cola Bottling Company of Atlanta, herein referred to as the Whitehead Company.

Rainwater testified that he had been engaged in the Coca-Cola business since 1902, that he was at present interested in 10 or 12 Coca-Cola companies, and that he had no interest in the instant proceedings. When asked to express his opinion as to the value of the franchise involved, he stated:

Well, the method, I think, of arriving at a value on a proposition of that kind, could be fairly accurately stated. Of course, at that time, a territory like Chicago was more or less speculative in value; and we could only set up a valuation very probably in line with what other territory similarly situated, very probably had accomplished; and from my observation in the business, and particularly of the success of certain large communities, I should say that, taking into consideration the population of Chicago and the amount of territory covered by the particular contract in question, that the franchise should [have] easily been worth $150,000 or $200,000.

He further testified that he believed a willing buyer would have paid a willing seller such a price for the franchise on March 1, 1913.

This witness was not familiar with the management or books of the Illinois Company for the period 1906 to 1913, and did not profess to have any actual knowledge of its business.

The stock sales made prior to March 1, 1913, are entitled to but little weight. The volume of stock sold is not large enough to indicate, clearly, any market value. However, such sales should not be wholly ignored.

The most potent evidence of value presented by petitioners was the testimony of Freeman and Rainwater. Those witnesses thoroughly qualified as expert, experienced Coca-Cola dealers. While they possessed no knowledge in 1913 of the individual plant here involved, they did have knowledge at that date of the Coca-Cola trade as it existed in the country in general. They knew the factors necessarily involved which would determine the value of a franchise to operate in a given area. At the date of the hearing they knew, at least historically, the condition of the area controlled by the franchise here involved, with reference to those necessary factors. Their appraisement of the March 1, 1913, value was not less than $100,000, and probably much greater. The company had set up on its books, prior to March 1, 1913, a value of $89,536.96.

It must be conceded that the expert testimony here submitted is vulnerable in several particulars, especially in view of the fact that neither of the witnesses was acquainted with the plant in question in 1913, or for several years thereafter, and, further, because of the fact that their estimate of value was not based on what had been accomplished in prior years, but rather on what could be accomplished under efficient management.

However, a franchise such as the one here involved, unlike many franchises, grants to its holder a monopoly of the business authorized thereby, and the problem of determining the value of the franchise is to know and consider the several pertinent and controlling factors that determine the probable volume of business that may reasonably be expected, and then by using a known percentage of profit on such volume, compute the annual profit and use such profit as a basis for determining the value of the franchise. The foregoing seems to have been the method used by the two witnesses hereinbefore named. Under the circumstances of this case, it seems that no other method was available. All the factors necessary in such a method were known to the witnesses. We believe that their testimony is worthy of substantial weight and should be strongly persuasive in effect. As we said in *H. H. Blumenthal*, 21 B. T. A. 901: " * * * We must give due and careful consideration to the opinions of those whose demonstrated qualifications give their opinions weight or authority." The opinion testimony herein is to the effect that the March 1, 1913, value of the franchise in question was not less than $100,000, and probably more. The books of the company show a valuation set up just prior to 1913, of $89,536.96, and petitioners are claiming the last named amount. We, therefore, find and hold the March 1, 1913, value of the franchise to be $89,536.96.

The individual petitioners, as transferees in liquidation of assets of the Illinois Company, each in an amount in excess of the deficiencies herein involved, and being liable as such transferees for the unpaid income and profits tax of that company for the year 1921, the unpaid income tax for the year 1922, and the unpaid income tax and penalty for the period January 1 to April 30, 1925, will have judgments issued against each of them in the full amount of such income taxes and penalty, as determined upon recomputation in accordance herewith, plus interest thereon from February 26, 1926. *Grand Rapids National Bank*, 15 B. T. A. 1166; *Annie G. Phillips et al.*, 15 B. T. A. 1218; and *Henry Cappellini et al.*, 16 B. T. A. 802.

Reviewed by the Board.

> *The proceeding of the Coca-Cola Bottling Company, Docket No. 31409, will be dismissed for lack of jurisdiction. Judgment will be entered under Rule 50 in the proceedings, Docket Nos. 27180, 27181, 27264, 27307, 31406, 31407, 31408, and 31550.*

SMITH, STERNHAGEN, and MURDOCK concur in the result only.